UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Habibah Abdul–Hakeem,<br>    *Plaintiff,*<br><br>    *v.*<br><br>Cara Parkinson and Corrine McCarthy,<br>    *Defendant.* | Civil No. 3:10cv747 (JBA)<br><br><br><br>January 25, 2012 |

RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

On May 14, 2010, Plaintiff Habibah Adbul–Hakeem filed a Complaint against Defendants Cara Parkinson and Corrine McCarthy, in their individual capacities, claiming that they deprived her of her Fourteenth Amendment equal protection rights. Defendants move [Doc. # 48] for summary judgment. For the reasons stated below, Defendants' motion will be granted.

I.   Undisputed Material Facts

At all times relevant to this action, Defendant Parkinson was employed by the Judicial Branch of the State of Connecticut ("Judicial") as a Deputy Chief Clerk under the direct supervision of Attorney Jorene Couture, Chief Clerk for the New London Judicial District, (Parkinson Aff., Ex. B to Defs.' Loc. R. 56(a)1 Stmt. ¶¶ 8–10), and Defendant McCarthy was a Deputy Clerk at the Norwich Superior Court under the direct supervision of Parkinson, (*Id.* ¶ 13; McCarthy Aff., Ex. C to Defs.' Loc. R. 56(a)1 Stmt., ¶¶ 11–12, 14). Both Defendants would receive directions from other employees of a higher grade, such as Maria Kewer, the Personnel Manager in the Court Operations Administration. (McCarthy Aff. ¶ 14; Parkinson Aff. ¶ 11.)

Abdul–Hakeem, an African–American, started with Judicial in 2005 as a "temporary assistant clerk" at the New London Superior Court. (Pl.'s Dep., Ex. A to Defs.' Loc. R. 56(a)1 Stmt. at 40:21–41:12.) In April 2008, Parkinson hired her for the permanent Office Clerk position at the Norwich Superior Court, which she held until she was promoted to Administrative Clerk at the New London Superior Court in April 2010, a position she holds today. (*Id.* at 41:18–43:19; Ex. B2 to Parkinson Aff.) Abdul–Hakeem's pay increased between April 2008 and November 2009, which she attributes to her increased time of service. (Pl.'s 56(a)(2) Statement [Doc. # 53–1] ¶ 21.) Abdul–Hakeem received treatment for mental health problems prior to starting at the Norwich Superior Court in April of 2008 and was diagnosed with bipolar disorder in 2009. (Pl.'s Dep. at 112:22–113:5.)

According to Abdul–Hakeem, during her probationary period up until October of 2008, Parkinson "inappropriately" touched her and used terms of endearment towards her when she was "outside of [Parkinson's] office near or at the filing cabinets. (*Id.* at 77:20–79:8.) Parkinson stated that "because of the narrow pathway from [her] office past the filing cabinets, [she] would place a hand on the back of employees who were filing so that they would not back up and knock me over" and admitted that she "place[d] her hand on the Plaintiff's back, above her waist." (Parkinson Aff. ¶ 80.) Ms. Abdul–Hakeem similarly testified in her deposition that Parkinson only touched her back, never her front, and only when she was facing the filing cabinets. (Pl.'s Dep. at 77:20–79:8.) She also testified that she did not know if Parkinson touched Caucasian employees' backs, but did recall Parkinson using similar terms of endearment with respect to white employees. (*Id.* at 78:11–25.) McCarthy claims that she "never observed Parkinson touch Ms. Abdul–Hakeem or anyone

else in the office inappropriately," (McCarthy Aff. ¶ 45). Parkinson avers that Plaintiff never "raise[d] any concern or objection to this limited touch[ing]." (Parkinson Aff. ¶ 80.)

Abdul–Hakeem testified during her deposition that at some point in 2008, the "whole office was pretty much moved around" by Parkinson, causing her desk to be moved "into a corner of the office," thereby separating her from Monique Perry, the only other African American female in the office. (Pl.'s Dep. at 51:2–56:10.) She also testified that David Gage, the Chief Deputy Clerk of the Norwich Judicial District, told her that McCarthy told him that Abdul–Hakeem "made a lot of mistakes," "wasn't going to pass [her] probation period," and was disliked by McCarthy. (*Id.* at 56:11–59:6.) Plaintiff also testified that she overheard McCarthy's husband, while visiting McCarthy, have a "conversation with the office in general about [her] coworker Chris who was gay," during which he made "several comments about gay people in general." (*Id.* at 59–61.) Although Plaintiff was "angry" about the incident, she only complained to her co–worker Monique and did not file a complaint until June 7, 2009. (*Id.*) In the spring of 2009, Abdul-Hakeem overheard a "snippet" of McCarthy's conversation with another employee where she said "something to the effect of this guy is out in the lobby talking in Ebonics." (*Id.* at 79–80, 123–124.) Also that spring, Abdul–Hakeem did not work from April 1, 2009 until May 4, 2009, and was subsequently on intermittent leave, due to a hysterectomy. (Parkinson Aff. ¶ 27; Exs. B7, B8.)

On May 19, 2009, Plaintiff had a private conversation with David Gage that she believed to be work related because the two spoke about a transfer opportunity to the New London Superior Court. (Pl.'s Dep. at 87–89.) That same afternoon she visited the lockup area of the courthouse on personal business—to inform her child's father that she could not

3

make it to court that day for a child support issue. (*Id.*) This visit was reported to Parkinson that afternoon and Plaintiff was subsequently called to her office. (*Id.* at 89.)

During the meeting, Parkinson orally reprimanded Plaintiff, telling her that Gage was not her supervisor and that she was being docked half an hour's pay for her unauthorized absence. (*Id.* at 87–88.) Defendants maintain that the meeting was to review Abdul–Hakeem's work performance at the direction of Kewer and Attorney Couture, and that both Parkinson and McCarthy, as well as Cheryl D'Mato and Attorney Couture, were present at the meeting. (Parkinson Aff. ¶ 28; McCarthy Aff. ¶¶ 18–19.) During the meeting McCarthy "took handwritten notes on what transpired," (*id.*, ¶ 18), while she "sat there and listened," (Pl.'s Dep. at 90). Plaintiff admits the conversation was "heated" and although both raised their voices, neither used profanity or racial slurs. (*Id.* at 92.) She believes, however, that the notes taken by McCarthy during the meeting were revised and exaggerated so as to portray her comments in a more threatening light.

The next day, on May 20, 2009, Kewer instructed Parkinson to give Abdul–Hakeem two warnings and a formal counseling. (Parkinson Aff. ¶ 29, Ex. B9.) The formal counseling addressed problems with Abdul–Hakeem's work performance since her May 4, 2009 return. (*Id.*, Ex. B15.) The written warning stated that it was for Abdul–Hakeem's conduct during the May 19, 2009 meeting and it accused her of "yelling at [Parkinson];" saying "tell the truth, shame the devil;" saying "if that is the game you want to play, we can do this;" and stating "bring it on sister." (Pl.'s Dep. at 93–95; Parkinson Aff., Ex. B14.) Abdul–Hakeem maintains that she never said "bring it on sister." (Pl.'s Dep. at 95.)

Later that day, Eileen Meehan, Personnel Manager, placed Abdul–Hakeem on a medical leave of absence pending a human resources investigation into her conduct and the

4

completion of an Employee Fitness for Duty Certification. (McCarthy Aff. ¶¶ 21, 23; Parkinson Aff., ¶¶ 39–41, Exs. B11, B12.) The notification to Plaintiff of the leave of absence stated that it was the result of Abdul–Hakeem's "demonstrated behaviors at work including [her] conduct and statements when [her] supervisors met with [her] to issue a written warning for a prior incident of inappropriate conduct . . . [in addition to her] unauthorized absences in the middle of the day" and the medications she reported being on. (Parkinson Aff., Ex. B11.) As she had done in the past with respect to other employees, Parkinson asked McCarthy and a judicial marshal escort Plaintiff out of the building. (McCarthy Aff. ¶ 23.)

Once placed on leave, Plaintiff was instructed that she was not to enter any Judicial Branch facility unless on official Judicial Branch business. (Parkinson Aff. Ex. B11.) Also that afternoon, Mrs. Dickerson, Abdul–Hakeem's mother, contacted Parkinson "about the plaintiff's behavior," (*Id.*, ¶ 33; Ex. B10), although Dickerson's affidavit says this was a gross misrepresentation of the conversation (Dickerson Aff. ¶¶ 3–6). Furthermore, Plaintiff's doctor, Craig Buggeln, indicated that he expected her to "be away from work for several days." (Parkinson Aff. Ex. B13.)

On June 2, 2009, a head judicial marshal informed McCarthy that he witnessed Plaintiff sitting in her car in the parking garage across from the courthouse and expressed his concern with Plaintiff's behavior. (McCarthy Aff. ¶ 24.) Kewer alerted Parkinson of this incident with a high priority email that indicated her belief this behavior was "very off" and her "strong reservations about [Plaintiff] returning to work." (Parkinson Aff. ¶ 45; Ex. B19.) On June 4, 2009, Plaintiff was informed that her Employee Fitness for Duty Certification was overdue, her absence was now unauthorized, and that a predisciplinary meeting was scheduled for June 10, 2009. (*Id.*, Ex. B24.) That day, Dr. Buggeln completed Plaintiff's

5

Employee Fitness for Duty Certification, noting that Plaintiff could return to work on June 22, 2009. (Parkinson Aff. ¶ 44, Exs. B22, B25.)

On June 19, 2009, McCarthy created and circulated a petition of concern with regard to Plaintiff's scheduled return to work because she was alarmed about Plaintiff's "erratic and aggressive behavior" in light of the parking garage incident. (McCarthy Aff. ¶¶ 27–28; Parkinson Aff. ¶ 49, Ex. B28.) Abdul–Hakeem learned of the petition that day from a co–worker. (Pl.'s Dep. at 65–71, Ex. A4.) When Parkinson found out about the petition, she emailed Kewer to express her concerns and sought direction. (Parkinson Aff., ¶ 50, Ex. B27.) After a conversation with her union representative McCarthy believed that, as a state Judicial employee, she had a duty to report workplace violence as required by Executive Order No. 16; accordingly, she decided that emailing the department heads was the correct way to express her concerns about Plaintiff's return. (McCarthy Aff. ¶ 29, Ex. 29.) Defendants maintain that McCarthy acted without Parkinson's knowledge and permission. (*Id.* ¶¶ 28; Parkinson Aff. ¶¶ 49–52.)

Upon Plaintiff's return to work on June 22, 2009, she was removed from the G.A. 21 Office and relocated to the J.D. office where she received J.D. assignments in addition to her G.A. assignments. (Pl.'s Interrog. at 9.) As a result, she had to "go back and forth between" the offices to perform her duties. (*Id.*) Additionally, she claims that a sign that read "HABIBAH'S WORK" was taped to her mailbox. (*Id.*) According to Plaintiff, no other employee had to work in two separate offices or was given such a sign. (*Id.*) Defendants were instructed by Kewer to only communicate with Plaintiff in writing and to not provide any oral instructions to her whatsoever (McCarthy Aff. ¶ 35, 38; Parkinson Aff. ¶¶ 58, 61), and they only communicated with her in writing until she was transferred. (*Id.* ¶ 36; Pl.'s Dep.

6

at 72–73). Parkinson and McCarthy were also instructed by Kewer and Couture to monitor and report problems with Abdul–Hakeem's performance and attendance. (Parkinson Aff. ¶ 60, Exs. B30, B32–33; McCarthy Aff. ¶ 37.) In a June 29, 2009 email, Kewer advised Parkinson and Couture to formally counsel Abdul–Hakeem for any performance or attendance issues that arose. (Parkinson Aff. ¶ 62, Ex. B30.) On June 30, 2009, Couture formally counseled Abdul–Hakeem about her work performance for the second time, as reflected in a formal counseling memo. (*Id.*, ¶ 63, Ex. B31.) Plaintiff received another written warning on August 6, 2009, which indicated that her expected performance improvement had not been seen. (*Id.*, ¶ 64–65, Exs. B34, B35.) At one point, Abdul–Hakeem expressed concerns that Parkinson was improperly coding her time sheets as 'Leave Unauthorized' even though Jule Rooney instructed Parkinson to do so on August 13, 2009 because Plaintiff did not submit a medical certificate for her FMLA leave. (Parkinson Aff. ¶ 66, Exs. B36, B42.)

In response to an email from Laurie–Ann Parent, Program Manager, asking if she would consider a transfer to another location, Plaintiff indicated that she would consider leaving Norwich for New London. (*Id.*, ¶ 67, Ex. B37.) While Defendants contend that they neither sought, nor were consulted about, Plaintiff's transfer (*id.* ¶ 68; McCarthy Aff. ¶ 39), Abdul–Hakeem argues that Parkinson specifically sought her transfer, and continued to search for openings after an initial transfer request to New London was denied. (Pl.'s 56(a)(2) Statement ¶ 133; Pl.'s Opp'n, Ex. 11.) In September or November of 2009 Plaintiff was transferred back to the New London courthouse. (Pl.'s Dep. at 43.) Additionally, on January 21, 2010, she entered into a Stipulated Agreement to resolve her time coding concerns and indicated she agreed to the transfer back to the New London courthouse. (Parkinson Aff. ¶ 78, Ex. B47.)

II. Discussion[1]

For her equal protection claim to survive summary judgment, Plaintiff must establish the four elements of a *prima facie* case of racial discrimination: (1) membership in a protected class; (2) qualification for the position she held; (3) an adverse employment action; and (4) circumstances giving rise to an inference of discrimination on the basis of membership in the protected class. *See McDonnell–Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004). Defendants argue that Plaintiff cannot satisfy either the third element, that Plaintiff suffered an adverse employment action, or the fourth element, evidence of discrimination on the basis of her race.

To establish circumstances giving rise to an inference of discrimination on the basis of her race in the absence of direct evidence of discrimination, which Plaintiff's counsel agreed at oral argument she does not have, Plaintiff must be able to show that she was treated differently than similarly situated individuals that were not members of her protected class. *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000); *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997). Such a showing requires that Plaintiff be "similarly

---

[1] "Summary judgment is appropriate where, construing all evidence in the light most favorable to the non-moving party," *Pabon v. Wright*, 459 F.3d 241, 247 (2d Cir. 2006), "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c)(2). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Unsupported allegations do not create a material issue of fact." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

8

situated in all material respects to the individuals with whom she seeks to compare herself." *Graham*, 230 F.3d at 39 (citing *Shumway*, 118 F.3d at 64).

Although Plaintiff identified seven alleged comparators in her responses to Defendants' interrogatories (*see* Pl.'s Resp. to Defs.' Interrogs., Ex. 2 to Pl.'s 56(a)2 Stmt. at 10–11), she has no factual support that a single alleged comparator performed similar job functions,[2] was subjected to the same disciplinary standards, engaged in similar conduct, or was treated more favorably. Instead, she alleges that she was subjected to treatment that "Caucasian employees similarly situated to the plaintiff were not," which, on its own, is insufficient to give rise to an inference of discrimination. *See O'Hazo v. Bristol–Burlington Health Dist.*, 599 F. Supp. 2d 242, 259 (finding Plaintiff's allegation that he was subjected to disparate treatment because similarly situated employees "received more favorable treatment" and were "subject to less criticism" on its own did not establish disparate treatment or an inference of discrimination).

Plaintiff's counsel acknowledged at oral argument that she did not "have any information about anyone really comparable to her." Without this necessary evidence of similarly situated comparators, Plaintiff cannot meet her burden of demonstrating circumstances that give rise to an inference of racial discrimination. In the absence of similarly situated individuals, her evidence of Defendants' actions at most reveals a pattern of mean–spiritedness; it does not demonstrate any race–based animus. Having failed to depose either of the Defendants, Plaintiff's counsel attempts to rely entirely on surmise and conjecture as to Defendants' motivations, which are insufficient to survive summary

---

[2] One of the comparators listed, Cheryl D'Amato, has been identified as one of Plaintiff's supervisors.

9

judgment. Because Plaintiff has no evidence of similarly situated individuals of a different race who were treated differently by Defendants, she has failed to establish circumstances that give rise to an inference of racial discrimination and has failed to establish a *prima facie* case of racial discrimination. Defendants are therefore entitled to summary judgment in their favor.

III.    Conclusion

For the reasons stated above, Defendants' motion [Doc. # 48] for summary judgment is GRANTED.

IT IS SO ORDERED.

_/s/_
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 25th day of January, 2012.